Filed 8/15/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| VOICES OF THE WETLANDS, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S160211 |
| v. | ) | |
| | ) | Ct.App. 6 H028021 |
| STATE WATER RESOURCES | ) | |
| CONTROL BOARD, et al., | ) | |
| | ) | Monterey County |
| Defendants and Respondents; | ) | |
| | ) | Super. Ct. No. M54889 |
| DUKE ENERGY MOSS LANDING, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Real Parties in Interest and | ) | |
| Appellants. | ) | |
| _____ | ) | |

Voices of the Wetlands, an environmental organization, filed this administrative mandamus action in the Monterey County Superior Court to challenge the issuance, by the California Regional Water Quality Control Board, Central Coast Region (Regional Water Board), of a federally required permit authorizing the Moss Landing Powerplant (MLPP) to draw cooling water from the adjacent Moss Landing Harbor and Elkhorn Slough.[1]  The case, now more than a

---

[1]     In the case title in this court, and hereafter in our discussion, we refer to Voices of the Wetlands, the mandamus petitioner, as "plaintiff."  (See Cal. Style Manual (4th ed. 2000) § 6:28, pp. 230-231.)  The mandamus petition named as respondents the State Water Resources Control Board (State Water Board) and the Regional Water Board.  In the case title in this court, and hereafter as convenient

*(Footnote continued on next page.)*

decade old, presents issues concerning the technological and environmental standards, and the procedures for administrative and judicial review, that apply when a thermal powerplant, while pursuing the issuance or renewal of a cooling water intake permit from a regional water board, also seeks necessary approval from another state agency, the State Energy Resources Conservation and Development Commission (Energy Commission), of a plan to add additional generating units to the plant, with related modifications to the cooling intake system.

Against a complex procedural backdrop, we will reach the following conclusions:

First, the superior court had jurisdiction to entertain the administrative mandamus petition here under review. We thus reject the contention of defendants and the real party in interest that, because the substantive issues plaintiff seeks to raise on review of the Regional Water Board's decision to renew

---

*(Footnote continued from previous page.)*

in our discussion, we refer to these parties as "defendants." (*Ibid.*) The mandamus petition also named Duke Energy North America LLC and its subsidiary, Duke Energy Moss Landing, LLC (collectively Duke), then the MLPP's owners, as real parties in interest. At some point, apparently during the appellate process, the MLPP changed ownership. The current owner is Dynegy Moss Landing LLC (Dynegy), an entity unrelated to Duke. Dynegy has filed all pleadings and briefs in this court as the MLPP's owner and as real party in interest. As Duke's successor in interest, Dynegy is entitled to continue the action in Duke's name (Code Civ. Proc., § 368.5), and Dynegy has not moved to substitute itself as a formally named party (see Cal. Rules of Court, rule 8.36(a)). Accordingly, to maintain title symmetry with the Court of Appeal decision, and to facilitate tracking and legal research by the bench, bar, and public, we have retained Duke in the case title in this court as the real parties in interest and appellants. (See Cal. Style Manual, *supra*, § 6:28, p. 230.) As the context dictates, our discussion hereafter refers variously to Duke, Dynegy, or "real party in interest" (singular or plural), or "the MLPP's owner."

2

the plant's cooling water intake permit were also involved in the Energy Commission's approval of the plant expansion, statutes applicable to the latter process placed exclusive review jurisdiction in this court.

Second, the trial court did not err when, after concluding that the original record before the Regional Water Board did not support the board's finding on a single issue crucial to issuance of the cooling water intake permit, the court deferred a final judgment, ordered an interlocutory remand to the board for further "comprehensive" examination of that issue, then denied mandamus after determining that the additional evidence and analysis considered by the board on remand supported the board's reaffirmed finding.

Third, recent United States Supreme Court authority confirms that, when applying federal Clean Water Act (CWA) standards for the issuance of this permit, the Regional Water Board properly utilized cost-benefit analysis, and in particular a "wholly disproportionate" cost-benefit standard, to conclude that the MLPP's existing cooling water intake design, as upgraded to accommodate the plant expansion, "reflect[ed] the *best technology available* for minimizing adverse environmental impact." (CWA, § 316(b); 33 U.S.C. § 1326(b) (hereafter CWA section 316(b)), italics added.)

We decline to address several other issues discussed by the parties. For instance, plaintiff insists the Regional Water Board violated CWA section 316(b) by approving compensatory mitigation measures — a habitat restoration program funded by the MLPP's owner — as a means of satisfying the requirement to use the best technology available (BTA). The legal issue whether section 316(b) allows such an approach is certainly significant (see *Riverkeeper, Inc. v. U.S. E.P.A.* (2d Cir. 2007) 475 F.3d 83, 110 (*Riverkeeper II*); *Riverkeeper, Inc. v. U.S. E.P.A.* (2d Cir. 2004) 358 F.3d 174, 189-191 (*Riverkeeper I*)), and it has not been finally resolved.

3

However, the trial court found, as a matter of fact, that the Regional Water Board had not directly linked the habitat restoration program to its BTA determination. The Court of Appeal concluded that the trial court's no-linkage finding had substantial evidentiary support. Here, as in the Court of Appeal, defendants and real party decline to pursue the legal issue, urging only that the trial court's factual finding should not be disturbed. As so framed, the issue presented is case and fact specific, and involves no significant question of national or statewide importance. Accordingly, we exercise our discretion not to consider it. (See Cal. Rules of Court, rule 8.516(b)(3).) By so proceeding, we expressly do not decide whether compensatory mitigation and habitat restoration measures can be a component of BTA, and we leave that issue for another day.

Finally, in its briefs on the merits, plaintiff advances issues it did not raise in its petition for review. Plaintiff now insists the evidence in the administrative record does not support the Regional Water Board's finding that the costs of alternative cooling technologies would be "wholly disproportionate" to their environmental benefits. Plaintiff also urges that even if the board properly considered compensatory restoration measures as a means of satisfying BTA, the record does not support its determination that the habitat restoration project it approved was sufficient to offset the environmental damage caused by the MLPP's cooling system.

These issues are case and fact specific, did not factor into our decision to grant review, and do not currently appear to be matters of significant national or statewide interest. Again, therefore, we decline to address them.

Accordingly, we will affirm the judgment of the Court of Appeal.

4

**FACTS AND PROCEDURAL BACKGROUND**

The MLPP, in operation under various owners for nearly 60 years, sits at the mouth of Elkhorn Slough, an ecologically rich tidal estuary that drains into Monterey Bay between the cities of Santa Cruz and Monterey. As a thermal powerplant, the MLPP uses superheated steam to generate electricity. The plant's cooling system appropriates water from Moss Landing Harbor, and water from the adjacent slough is also drawn into the system. The MLPP has traditionally employed a once-through cooling system, in which water continuously passes from the source through the plant, then back into the source at a warmer temperature. The thermal effects of the cooling system aside, the intake current kills some aquatic and marine life by trapping larger organisms against the intake screens (impingement) and by sucking smaller organisms through the screens into the plant (entrainment).[2]

Under the CWA, the MLPP must have a National Pollutant Discharge Elimination System (NPDES) permit in order to draw cooling water from the harbor and slough. The discharge of a "pollutant" from a "point source" into navigable waters may only occur under the terms and conditions of such a permit, which must be renewed at least every five years. (33 U.S.C. §§ 1311, 1342(a),

---

[2]     Alternative cooling technologies exist, particularly including closed-cycle and dry-cooling systems. A closed-cycle system uses a holding basin, reservoir, or tower to retain, cool, and continuously recycle a single supply of cooling water within the plant. Such a system requires renewal from an outside water source only to replace evaporation loss. Dry cooling eliminates the need for cooling water, instead employing air as the cooling medium. These designs substantially reduce or eliminate impingement and entrainment damage, as compared to a once-through water cooling system, but they may produce their own adverse environmental effects, and converting an existing powerplant from a once-through system to closed-cycle or dry-cooling technology involves significant additional expense.

(b).)  In California, NPDES permits, which must comply with all minimum federal clean water requirements, are issued under an EPA-approved state water quality control program administered, pursuant to the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; Wat. Code, § 13000 et seq.), by the State Water Board and the nine regional water boards.  (*Id.*, §§ 13372, 13377; see 33 U.S.C., § 1342(b); 40 C.F.R. §§ 123.21-123.25 (2011); 39 Fed.Reg. 26061 (Jul. 16, 1974); 54 Fed.Reg. 40664-40665 (Oct. 31, 1989).)

In 1999, Duke applied to the Energy Commission for approval of Duke's plan to modernize the MLPP by adding two new 530-megawatt gas-fired generators.  These new units would supplement the two 750-megawatt generators, units 6 and 7, already in operation, and would replace units 1 through 5, older generators that were no longer being used.  Pursuant to the Warren-Alquist State Energy Resources Conservation and Development Act (Warren-Alquist Act; Pub. Resources Code, § 25000 et seq.), the siting, construction, or modification of a thermal powerplant with a generating capacity in excess of 50 megawatts must be certified by the Energy Commission.  (*Id.*, §§ 25110, 25120, 25500.)  As set forth in greater detail below, the commission's certification must be consistent with all applicable federal laws (*id.*, §§ 25514, subd. (a)(2), 25525), and is "in lieu of any permit, certificate, or similar document required by any state, local or regional agency, or federal agency to the extent permitted by federal law" (*id.*, § 25500).

Concurrently with its Energy Commission application, Duke applied to the Regional Water Board for renewal of its NPDES permit — which was due to expire in any event — and to include therein terms and conditions consistent with operation of the new generators.  In both applications, Duke proposed various modifications to the design and operation of the existing once-through cooling

6

system, both to accommodate the new generators, and to minimize aquatic and marine mortality resulting from cooling water intake operations.[3]  However, the proposal did not contemplate conversion of the plant to either a closed-cycle or a dry-cooling system (see fn. 2, *ante*).

In order to renew the plant's NPDES permit, the Regional Water Board was required, among other things, to determine, under section 316(b) of the CWA, that "the location, design, construction, and capacity of [the MLPP's] cooling water intake structures reflect[ed] the best technology available for minimizing adverse environmental impact [i.e., BTA]."  (33 U.S.C. § 1326(b); see *id.*, §§ 1316(b)(1)(A), 1342(b)(1)(A).)  In the year 2000, when the MLPP's Energy Commission and Regional Water Board applications were pending, there were no federal regulations in place directing permitting agencies how to apply the BTA standard.  When lacking regulatory guidance for applying the CWA's NPDES permit standards, including section 316(b)'s BTA standard for cooling water intake structures, agencies were expected to exercise their "best professional judgment" on a case-by-case basis.  (See, e.g., *Entergy Corp. v. Riverkeeper, Inc.* (2009) 556 U.S. 208, ___ [129 S.Ct. 1498, 1503] (*Entergy Corp.*); *National Resources Defense Council v. U.S. E.P.A.* (9th Cir. 1988) 863 F.2d 1420, 1425.)

---

[3]     As the Regional Water Board's order issuing the NPDES permit explained, the MLPP had two cooling water intake stations, one which served the currently operational units 6 and 7, and the other, then inactive, which had served the retired units 1 through 5.  Under the MLPP proposal, this latter station would be reactivated to serve the proposed new generators.  Changes in the design and operation of the existing once-through cooling system would be employed to reduce impingement mortality, including alterations in the angles of the intake screens, the use of finer mesh on the screens, reductions in cooling water intake velocity made possible by the design of the new generators, and the elimination of a 350-foot tunnel in front of the intake screens.

The Energy Commission and Regional Water Board proceedings went forward concurrently, and were coordinated to a significant degree. As noted by the Court of Appeal, " 'the [Energy] Commission and the [Regional Water Board] formed a Technical Working Group (TWG) made up of representatives from various regulatory agencies, the scientific community, and Duke . . . . The TWG worked to design biological resource studies and then validate the results of those studies.' "

On October 25, 2000, after full agency review and opportunity for public comment, the Energy Commission approved the application for certification and authorized construction of the MLPP modernization project. Under the federal-compliance provisions of the Warren-Alquist Act, the commission addressed the BTA issue. In this regard, the commission determined that design alternatives to Duke's proposed modifications of the MLPP's cooling intake system either would not significantly reduce environmental damage to the source of cooling water, or were economically infeasible, and that the proposed modifications represented the most effective economically feasible alternative considered. The commission thus concluded that this proposal represented BTA for purposes of section 316(b) of the CWA, though it "recommend[ed]" that, prior to each five-year renewal of the NPDES permit, the Regional Water Board require the plant's owner to provide an analysis of "alternatives and modifications to the cooling water intake system 1.) which are feasible under [the California Environmental Quality Act] and 2.) [which] could significantly reduce entrainment impacts to marine organisms."

As a separate condition of certification, the Energy Commission specified that the MLPP's owner would provide $7 million to fund an Elkhorn Slough watershed acquisition and enhancement project. The commission concluded that compliance with "existing and new permits, including the . . . NPDES . . . permit[,] will result in no significant water quality degradation." Finally, the

8

commission entered a formal finding that the conditions of certification, if implemented, would "ensure that the project will be designed, sited, and operated in conformity with applicable local, regional, state, and federal laws, ordinances, regulations, and standards, including applicable public health and safety standards, and air and water quality standards."

On October 27, 2000, after similar full procedures, the Regional Water Board issued its revised Waste Discharge Requirements Order No. 00-041 (Order No. 00-041), which included NPDES permit No. CA0006254, applicable to the MLPP. The stated purpose of the order was to permit, pursuant to conditions and limitations specified in the order, the "discharge of industrial process wastewater, uncontaminated cooling water and storm water from the [MLPP]."

In finding No. 48 of its order, the Regional Water Board addressed CWA section 316(b)'s BTA mandate, as required for issuance of the permit. The order recited that the powerplant "must use BTA to minimize adverse environmental impacts caused by the cooling water intake system. *If the cost of implementing any alternative for achieving BTA is wholly disproportionate to the environmental benefits to be achieved, the Board may consider alternative methods to mitigate these adverse environmental impacts. In this case the costs of alternatives to minimize entrainment impacts are wholly disproportionate to the environmental benefits.* However, Duke Energy will upgrade the existing intake structure for the new units to minimize the impacts due to impingement of larger fish on the traveling screens, and will fund a mitigation package to directly enhance and protect habitat resources in the Elkhorn Slough watershed. . . ." (Italics added.)

In finding No. 49, the Regional Water Board set forth the required cooling system modifications and the environmental results to be expected therefrom. Subsequent findings detailed the features of the habitat enhancement program to be funded by a $7 million deposit from the powerplant's owner.

9

No person or entity sought administrative or judicial relief to stop or stay construction or operation of the plant additions and modifications under the terms and conditions of the Energy Commission's certification order, nor was any other form of judicial review of the commission's order pursued. The project to install the two new generating units at the MLPP, with attendant modifications to the cooling intake system, has since been constructed, and has been in operation since 2002.

Meanwhile, plaintiff did file with the State Water Board an administrative appeal of the Regional Water Board's Order No. 00-041. On June 21, 2001, the State Water Board rejected the appeal.

On July 26, 2001, plaintiff filed the instant petition for administrative mandamus (Code Civ. Proc., § 1094.5 (section 1094.5)) in the Monterey County Superior Court (No. M54889). The petition claimed that the Regional Water Board had failed to comply with the CWA, in that the October 2000 NPDES permit issued to Duke did not satisfy the BTA requirement of section 316(b) of that statute. The prayer for relief asked that Order No. 00-041, issuing the permit, be set aside. However, plaintiff did not seek injunctive or other relief to halt, delay, or suspend the operative effect of the 2000 NPDES permit while the mandamus challenge was pending.[4]

Defendants and real parties demurred to the petition, asserting, among other things, lack of subject matter jurisdiction, in that the claims for relief concerned matters determined by the Energy Commission, whose decisions the Warren-Alquist Act insulates from review by the superior court. The commission, as

---

[4] The 2000 NPDES permit here at issue expired in 2005. We are advised that the MLPP's cooling system is currently operating under an administrative extension of this permit. (See 40 C.F.R. § 122.6 (2011).)

amicus curiae, filed a supporting memorandum. The trial court overruled the demurrers. Duke sought a writ of mandate in the Court of Appeal, Sixth Appellate District, to challenge this decision. (*Duke Energy Moss Landing v. Super. Ct.*, May 3, 2002, H024416.) The Court of Appeal summarily denied mandate.

The superior court then considered plaintiff's claims on the merits. On October 1, 2002, after a hearing, the court issued its intended decision. In this tentative ruling, the court rejected finding No. 48 of the Regional Water Board's Order No. 00-041 — the board's determination that the MLPP's cooling water system satisfied BTA — concluding that this finding was not supported by the weight of the evidence. The intended decision proposed to order issuance of a peremptory writ of mandate, directing the board "to conduct a thorough and comprehensive analysis of [BTA] applicable to the [MLPP]." However, the intended decision specified that "[n]othing in this decision compels an interruption in the ongoing plant operation during the . . . board's review of this matter."

On October 29, 2002, after receiving initial objections from real parties, the court designated the intended decision as the statement of decision and ordered plaintiff to prepare a proposed judgment for review and signature. Plaintiff submitted a proposed judgment granting a peremptory writ of mandate and setting aside the challenged NPDES permit.

Defendants and real parties objected that a judgment setting aside the permit would conflict with the intended decision's proviso that no interruption in current plant operations was being ordered, and would require the Regional Water Board to start the NPDES permit process over from "square one." These parties submitted an alternative proposed judgment that granted the peremptory writ and remanded to the board "for further proceedings in [the board's] discretion that are consistent with this Judgment and the Statement of Decision," again specifying

11

that nothing in the judgment compelled an interruption in ongoing plant operations pending the board's review.

Ultimately, on March 7, 2003, the court issued an order which (1) stated that finding No. 48 was not supported by the weight of the evidence, (2) remanded Order No. 00-041 to the Regional Water Board "to conduct a thorough and comprehensive analysis with respect to Finding No. 48," and (3) directed the board to advise the court when it had completed its proceedings on remand "so that the [c]ourt may schedule a status conference." Plaintiff's petition for mandate in the Court of Appeal, seeking to set aside the March 7, 2003, order (*Voices of the Wetlands v. Super. Ct.*, Apr. 18, 2003, H025844) was summarily denied.

On remand, the Regional Water Board issued a notice soliciting written testimony, evidence, and argument from the parties — including, for this purpose, both plaintiff and the Energy Commission — as to (1) what alternatives to once-through cooling were effective to reduce entrainment, (2) the costs, feasibility, and environmental benefits of such alternatives, and (3) whether the costs of any such alternatives were wholly disproportionate to their environmental benefits. The parties, and the board's staff, thereafter submitted voluminous materials in conformity with the notice.

On May 15, 2003, the Regional Water Board held a public hearing on the issues specified in the remand order. Plaintiff participated in the hearing. The parties had the opportunity to summarize their evidence, cross-examine witnesses, and present closing arguments. Members of the public in attendance were also allowed to comment. The board members' discussion indicated a majority view that closed-cycle cooling, despite its ability to reduce entrainment, would actually have adverse effects on air and water quality and would reduce plant efficiency, and that more expensive cooling alternatives were not justified by their environmental benefits, given the overall good health of the adjacent marine

12

habitat after 50 years of plant operations. These considerations, the board majority concluded, supported the original determination that the costs of alternatives to the MLPP's once-through cooling system were wholly disproportionate to the corresponding environmental benefits. By a four-to-one vote, the board approved a motion declaring that, for the reasons specified in the foregoing discussion, "Finding [No.] 48 in NPDES order 00041 is supported by the weight of the evidence."

Plaintiff filed an administrative appeal of the Regional Water Board's decision on remand. The State Water Board summarily denied the appeal on grounds that it failed to "raise substantial issues that are appropriate for review."

On October 15, 2003, plaintiff filed a second superior court mandate petition (*Voices of the Wetlands v. Cal. Regional Water Quality Control Bd.*, Super. Ct. Monterey County, No. M67321), attacking the Regional Water Board's resolution on remand on multiple grounds. On July 21, 2004, acting on the petition at issue here, No. M54889, the court issued a statement of decision resolving the postremand issues the parties had agreed remained open. In pertinent part, the court ruled that (1) the board's limitation on the scope of the remand issues complied with the court's remand order, (2) in deciding whether Finding No. 48 had sufficient support, the court could consider the new evidence developed on remand, (3) plaintiff was correct that mitigation measures could not be considered in determining BTA (citing *Riverkeeper I*, *supra*, 358 F.3d 174), but the board had not used the $7 million Elkhorn Slough habitat restoration plan as a "substitute" for selecting BTA, and the board's BTA determination "[did] not rest on that plan as the basis for its [BTA] finding," and (4) the board on remand conducted "a sufficiently comprehensive analysis of the potential technological alternatives" to once-through cooling, "and the record contains a realistic basis for

13

concluding that the existing modified [cooling] system provides [BTA] for the [MLPP]."

On August 17, 2004, the court entered judgment denying a peremptory writ of mandate in No. M54889. On the parties' stipulation, the court thereafter entered an order of dismissal with prejudice in No. M67321.

Plaintiff appealed in No. M54889, urging that the trial court erred in ordering an interlocutory remand, and in denying mandate to overturn the NPDES permit on grounds that the Regional Water Board had improperly determined BTA. Defendants and real parties in interest cross-appealed on the issue whether the superior court had jurisdiction to entertain the mandamus petition.

Meanwhile, in July 2004, the EPA finally promulgated regulations setting BTA standards for the cooling systems of existing powerplants. (69 Fed.Reg. 41576-01 (Jul. 9, 2004); see 40 C.F.R. § 125.90 et seq. (2011) (Phase II regulations).)[5] As explained in greater detail below, the Phase II regulations established national performance standards based on the impingement and entrainment mortality rates to be expected from closed-cycle cooling (see fn. 2, *ante*). However, the regulations allowed existing facilities to meet those standards by alternative cooling system technologies, or, where reliance on such a technology alone was less feasible, less cost effective, or less environmentally desirable, by using restoration measures as a supplementary aid to compliance. A facility could also obtain a site-specific determination of BTA based on performance "as close as practicable" to the national standards, where, in the particular case, the costs of strict compliance would be "significantly greater" than

---

[5] The EPA had previously issued regulations governing BTA for the cooling systems of new powerplants. (Phase I regulations.)

14

those considered by the EPA director when formulating the regulations (the "cost-cost" alternative), or than the environmental benefits to be expected (the "cost-benefit" alternative).  (40 C.F.R. § 125.94 (2011).)

In 2007, while the instant appeal was pending, the United States Court of Appeals for the Second Circuit issued its decision in *Riverkeeper II*, addressing the Phase II regulations.[6]  The *Riverkeeper II* court concluded that these regulations were invalid under section 316(b) of the CWA insofar as they permitted the use of (1) cost-benefit analysis (as opposed to stricter cost-effectiveness analysis)[7] and (2) compensatory restoration measures for purposes of determining BTA. (*Riverkeeper II*, *supra*, 475 F.3d 83, 98-105, 108-110, 114-115.)

Thereafter, the Court of Appeal for the Sixth Appellate District unanimously affirmed the trial court judgment in this case.  The Court of Appeal concluded that (1) the superior court properly entertained the mandamus petition; (2) the court did not err by ordering, in advance of a final judgment, an interlocutory remand to the Regional Water Board; (3) the board properly considered new evidence on remand; (4) section 316(b) of the CWA does not permit the use of compensatory restoration measures as a factor in establishing BTA (citing *Riverkeeper II*), but substantial evidence in the administrative record supports the trial court's determination that the board did not employ mitigation measures as " 'a *substitute* for selecting the best technology available' "; (5)  the board could properly conclude that BTA did not require the implementation of

---

[6]     In *Riverkeeper I*, *supra*, 358 F.3d 174, the same court of appeals had previously considered challenges to the Phase I regulations.

[7]     Thus, *Riverkeeper II* concluded that section 316(b)'s BTA standard does allow selection of the least costly technology "whose performance does not essentially differ from the performance of the best-performing technology whose cost the industry reasonably can bear."  (*Riverkeeper II*, *supra*, 475 F.3d 83, 101.)

15

cooling technologies whose costs were "wholly disproportionate" to their environmental benefits; and (6) the administrative record substantially supports the trial court's ultimate determination that, in the MLPP's case, the costs of alternative technologies to once-through cooling were wholly disproportionate to the expected environmental results.

Plaintiff sought review, raising three contentions: (1) section 316(b) of the CWA does not permit a cost-benefit analysis, such as the Regional Water Board's "wholly disproportionate" standard, in determining BTA; (2) the board improperly accepted compensatory restoration measures — specifically, the $7 million Elkhorn Slough habitat enhancement program — as a factor in achieving BTA; and (3) the trial court improperly ordered an interlocutory remand after finding insufficient evidence to support the board's BTA finding. In its answer to the petition for review, Dynegy urged that if review was granted, we should conclude the superior court lacked subject matter jurisdiction, because the BTA determination was subsumed in the Energy Commission's powerplant certification, as to which review was solely in this court.

We granted review and deferred briefing pending the United States Supreme Court's resolution of the then-pending petitions for certiorari in *Riverkeeper II*. The high court subsequently granted certiorari. In April 2009, the court issued its decision in *Entergy Corp.*, resolving certain of the issues addressed by the court of appeals in *Riverkeeper II*. Our discussion below proceeds accordingly.

16

## DISCUSSION[8]

### A. Superior court jurisdiction.

Pursuant to the Porter-Cologne Act, decisions and orders of the Regional Water Board, including the issuance and renewal of NPDES permits, are reviewable by administrative appeal to the State Water Board, and then by petition for administrative mandamus in the superior court. (§ 1094.5; Wat. Code, §§ 13320, 13330.) In the mandamus proceeding, the superior court is obliged to exercise its independent judgment on the evidence before the administrative agency, i.e., to determine whether the agency's findings are supported by the weight of the evidence. (§ 1094.5, subd. (c); Wat. Code, § 13330, subd. (d).)

Plaintiff pursued these avenues of relief. Nonetheless, defendants and Dynegy, joined by the Energy Commission as amicus curiae, urge at the outset that the superior court lacked jurisdiction to entertain plaintiff's petition for mandate in this case. The trial court and the Court of Appeal rejected this contention. We do so as well.

The jurisdictional argument is based on the Warren-Alquist Act, which mandates simplified and expedited processing and review of applications to certify the siting, construction, and modification of thermal powerplants. The Warren-Alquist Act accords the Energy Commission "the exclusive power to certify all sites and related facilities" for thermal powerplants with generating capacities of

---

[8] The Energy Commission has filed an amicus curiae brief urging, in support of defendants and Dynegy, that the Regional Water Board's permit decision was properly reviewable only in this court. An amicus curiae brief in support of plaintiff has been jointly filed by the North Coast Unified Air Quality Management District, the Northern Sonoma County Air Pollution Control District, the South Coast Air Quality Management District, and the San Diego County Air Pollution Control District.

50 or more megawatts, "whether a new site and related facility or a change or addition to an existing facility." (Pub. Resources Code, § 25500; see also *id.*, §§ 25110, 25119, 25120.) When a certification application is filed, the commission undertakes a lengthy review process that involves multiple staff assessments, communication with other state and federal regulatory agencies, environmental impact analysis, and a series of public hearings. (*Id.*, §§ 25519-25521.) With an exception not relevant here, the commission may not certify a proposed facility that does not meet all applicable federal, state, regional, and local laws. (*Id.*, § 25525.) Accordingly, "[t]he issuance of a certificate by the commission shall be in lieu of any permit, certificate, or similar document required by any state, local or regional agency, or federal agency to the extent permitted by federal law, for such use of the site and related facilities, and shall supersede any applicable statute, ordinance, or regulation of any state, local, or regional agency, or federal agency to the extent permitted by federal law." (*Id.*, § 25500.)

The Warren-Alquist Act also constrains judicial review of an Energy Commission powerplant certification decision. Between 1996 and 2001, the statute provided that review of such a decision was exclusively by a petition for writ of review in the Court of Appeal or the Supreme Court. (Pub. Resources Code, former § 25531, subd. (a); Pub. Utilities Code, § 1759, subd. (a).)[9] An

_____

[9] Adopted as part of the Public Utilities Act in 1951, Public Utilities Code section 1759, subdivision (a), originally provided for exclusive Supreme Court review of the Public Utility Commission's decisions and orders. (Stats. 1951, ch. 764, § 1759, p. 2091.) Public Resources Code section 25531, subdivision (a), adopted as part of the Warren-Alquist Act in 1974, originally provided that review of powerplant siting decisions by the Energy Commission would be the same as for Public Utility Commission decisions granting or denying certificates of public convenience and necessity for powerplants. (Stats. 1974, ch. 276, § 2, p. 532.) In 1996, Public Utilities Code section 1759, subdivision (a), was amended to allow review of Public Utilities Commission decisions either by this court or by the

*(Footnote continued on next page.)*

18

emergency amendment to Public Resources Code section 25531, subdivision (a), effective in May 2001, establishes that this court alone now has jurisdiction to review powerplant certification decisions by the commission. (Pub. Resources Code, § 25531, subd. (a), as amended by Stats. 2001, 1st Ex. Sess. 2001-2002, ch. 12, § 8, pp. 8101-8102.)

Subdivision (c) of Public Resources Code section 25531 further provides that "[s]ubject to the right of judicial review of decisions of the [Energy] [C]ommission," as set forth in subdivision (a), "no court in this state has jurisdiction to hear or determine any case or controversy concerning any matter which was, or could have been, determined in a proceeding before the commission, or to stop or delay the construction or operation of any thermal powerplant except to enforce compliance with the provisions of a decision of the commission."

Defendants and Dynegy urge as follows. Under the particular circumstances of this case, the fundamental issue presented — whether the MLPP's once-through cooling water intake system satisfied BTA for purposes of section 316(b) of the CWA — is one which "was, or could have been" (Pub. Resources Code, § 25531, subd. (c)), and indeed, had to be, determined in the certification proceeding before the Energy Commission. In order to certify the proposed expansion of the MLPP, the commission was required to find, and did find, that the project, including the intended modifications to the MLPP's cooling intake system, conformed to all applicable local, state, and federal laws, including

*(Footnote continued from previous page.)*

Court of Appeal. (Stats. 1996, ch. 855, § 10, p. 4555.) The effect, under then-unamended Public Resources Code section 25531, subdivision (a), was to establish similar review for Energy Commission powerplant siting certifications.

section 316(b).  Hence, the "case or controversy" advanced by plaintiff "concern[s] a matter" within the commission's purview, and was thus subject to the Warren-Alquist Act's exclusive-review provisions, with which plaintiff did not comply.

Plaintiff makes the following response:  Entirely aside from the plant expansion project, the MLPP cannot operate its cooling water intake system without a federally required, time-limited NPDES permit.  Under both federal and state law, only the State Water Board and the regional water boards have authority in California to issue or renew such permits.  Although the MLPP's NPDES permit renewal process coincided with its Energy Commission certification proceedings, and the two matters were significantly coordinated, it is the Regional Water Board's decision to renew the NPDES permit, not the Energy Commission's certification of the plant expansion, that is the subject of this "case or controversy."  The Porter-Cologne Act thus provides for mandamus review by the superior court of the Regional Water Board's permit decision.

Indeed, plaintiff emphasizes, such a conclusion in this case does not thwart the Warren-Alquist Act's purpose to expedite the certification of new powerplant capacity.  Plaintiff notes that it never sought to stop, delay, or suspend the construction and operation of the MLPP expansion project in conformity with the Energy Commission's certification, including the approved modifications to the cooling water intake system, and the project has long since been implemented.

Applying well-established principles of statutory construction, we conclude, as did the Court of Appeal, that plaintiff has the better argument.  When interpreting statutes, we begin with the plain, commonsense meaning of the language used by the Legislature.  (E.g., *Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 288.)  If the language is unambiguous, the plain meaning controls.  (*Ibid.*)  Potentially conflicting statutes

20

must be read in the context of the entire statutory scheme, so that all provisions can be harmonized and given effect. (*San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831.)

Here, however, there is no actual conflict. Under the plain language of the two statutory schemes, as applicable to this case, each agency — the Regional Water Board and the Energy Commission — had exclusive jurisdiction in a discrete area of thermal powerplant operations, and a distinct provision for judicial review applied in each case. Under the Warren-Alquist Act, the commission had sole authority to certify, i.e., to grant general permission for, the MLPP's proposal to install and operate additional generating capacity, and to modify other plant systems as necessary to accommodate this expansion. There is no question, under the unambiguous language of the Warren-Alquist Act, that the commission's certification order was subject to judicial review in this court alone. Plaintiff did not seek judicial review of the commission's certification decision, and that determination has long since become final and binding.

However, as defendants and Dynegy concede, regardless of any plans for new generating capacity that might involve the Energy Commission, a federal law, the CWA, obliged the MLPP to have in effect at all times a valid NPDES permit in order to cycle cooling water from Elkhorn Slough and Moss Landing Harbor in and out of the plant. The Porter-Cologne Act assigns the exclusive authority to issue, renew, and modify such permits to the State Water Board and the regional water boards. This statute further plainly specifies that these agencies' decisions are reviewable by mandamus in the superior court. Plaintiff mounted such a judicial challenge to the NPDES permit renewal granted to the MLPP by the Regional Water Board.

Defendants and Dynegy note that the Warren-Alquist Act requires the Energy Commission, before issuing a powerplant certification, to find conformity

21

with all "applicable local, regional, state, and federal standards, ordinances, or laws." (Pub. Resources Code, § 25523, subd. (d)(1); see also *id.*, § 25514, subd. (a)(2).) Hence, these parties insist, the issue underlying this litigation — whether the MLPP's cooling water intake system, with its proposed modifications, satisfied BTA for purposes of the CWA — is a "matter" which, in this particular instance, "was, or could have been, determined" by the Energy Commission (Pub. Resources Code, § 25531, subd. (c)) as a necessary component of its decision to certify the plant expansion. Accordingly, the argument runs, only this court had "jurisdiction to hear or determine any case or controversy concerning [that] matter." (*Ibid.*)

We are not persuaded. When the judicial review provisions of the Warren-Alquist Act, as set forth in Public Resources Code section 25531, are read in context, the meaning of subdivision (c)'s critical phrase "any case or controversy concerning any matter which was, or could have been, determined in a proceeding before the [Energy] [C]ommission" is unmistakably clear.

We must analyze the words of subdivision (c) of Public Resources Code section 25531 in conjunction with subdivision (a) of the same section. Subdivision (a) specifies the extent of this court's exclusive direct review jurisdiction as mandated by the Warren-Alquist Act. Under subdivision (a), "[t]he decisions of the [Energy] [C]ommission *on any application for certification of a site and related facility* are subject to review by the Supreme Court of California." (Italics added.) Read together with subdivision (a), subdivision (c) simply confirms that no other court may review directly a *certification decision* of the commission, or may otherwise entertain a "case or controversy" that attacks *such a decision* indirectly by raising a "matter" the commission determined, "or could have . . . determined," *for purposes of* the certification proceeding. Section 25531 neither states nor implies a legislative intent to interfere with normal mandamus

22

review of the actions of *another* agency, simply because that agency, exercising functions within *its* exclusive authority, has independently decided an issue the commission also must or might have addressed for its own purposes.

The Energy Commission did find, in connection with the MLPP's certification application, that the cooling system modifications proposed in connection with the expansion project satisfied the CWA's BTA requirement. But the commission made this finding only to support its decision, under the Warren-Alquist Act, to certify the proposed expansion. If plaintiff had challenged this certification on grounds the commission's BTA finding was improper, the "case or controversy concerning [that] matter" (Pub. Resources Code, § 25531, subd. (c)) could only have proceeded in accordance with the Warren-Alquist Act.

However, despite the interagency cooperation on the MLPP's expansion application, and the agencies' agreement that the plant's cooling system satisfied BTA, the fact remains that only the Regional Water Board had authority, under the Porter-Cologne Act, and by EPA approval for purposes of the CWA, to determine the BTA issue *as necessary for renewal of the plant's federally required NPDES permit.*

Defendants and Dynegy concede this exclusive administrative authority of the Regional Water Board. Nonetheless, they imply that the board's BTA finding was ratified, adopted, and subsumed in the Energy Commission's certification decision. Such is not the case. By law, each agency made an independent BTA determination, based on its distinct and separate regulatory function. Had the two agencies disagreed about BTA, the Energy Commission might still have been able to certify the plant expansion, but it could not have overruled or countermanded a decision by the Regional Water Board to deny or condition an NPDES permit renewal on grounds the plant's cooling system did not satisfy BTA.

23

It follows that, by attacking only the Regional Water Board's decision to renew the plant's federally required NPDES permit, plaintiff has not raised a "case or controversy concerning any matter which was, or could have been, determined in a proceeding before the [Energy] [C]ommission." (Pub. Resources Code, § 25531, subd. (c).) Hence, plaintiff's lawsuit, limited to an examination of the propriety of the permit renewal, is not affected by the judicial review provisions of the Warren-Alquist Act.

Defendants and Dynegy point out that under the Warren-Alquist Act, "[t]he issuance of a certificate by the [Energy] [C]ommission" for the siting, construction, or expansion of a thermal powerplant "shall be in lieu of any permit, certificate, or similar document required by any state, local or regional agency, or federal agency to the extent permitted by federal law, for such use of the site and related facilities, and shall supersede any applicable statute, ordinance, or regulation of any state, local, or regional agency, or federal agency to the extent permitted by federal law." (Pub. Resources Code, § 25500.) Under this provision, a commission certification clearly supplants and supersedes all state, county, district, and city permits and approvals that would otherwise be required for the siting, construction, and expansion of a thermal powerplant.

But Public Resources Code section 25500 acknowledges, as it must, the supremacy of *federal* law. Under the CWA, a federal statute, any facility that discharges wastewater into a navigable water source, as the MLPP has always done, must have an unexpired permit, conforming to federal water quality standards, in order to do so. Pursuant to the regulatory approval of a "federal agency," the EPA, only the State Water Board or a regional water board may issue a federally compliant discharge permit; such a decision is entirely outside, and independent of, the Energy Commission's authority. Under the Porter-Cologne

24

Act, judicial review of the decisions of these agencies, including those to grant or renew NPDES permits, is by mandamus in the superior court.

Defendants and Dynegy nonetheless insist that the NPDES permit at issue here is a *state*, not a federal, permit, as to which federal law requires no particular avenue of review beyond minimum standards of due process. Hence, these parties urge, the state agency's decision is entirely subject, within the limits of due process, to the state's own preferences for judicial review. Accordingly, they assert, California may conclude, and has concluded, that when the issuance of a wastewater discharge permit is linked to a powerplant certification proceeding, the Warren-Alquist Act's "one-stop shopping" requirement of exclusive review by this court prevails over the review provisions that would otherwise apply, under the Porter-Cologne Act, to decisions of the State Water Board and the regional water boards.

The contention lacks merit. It is true, as these parties observe, that the CWA does not directly delegate to a state agency the authority to administer the federal clean water program; instead, it allows the EPA director to "suspend" operation of the federal permit program in individual states in favor of EPA-approved permit systems that operate under those states' own laws in lieu of the federal framework. (33 U.S.C. § 1342(b); see *Shell Oil Company v. Train* (9th Cir. 1978) 585 F.2d 408, 410.) But the distinction is of little moment for our purposes. The state-administered program must conform to federal standards, and it must be approved by a federal agency, the EPA. In California, the EPA has approved a program under which the federally required permits are issued and renewed, not by the Energy Commission, but solely by the State Water Board and the regional water boards. (54 Fed.Reg. 40664-40665 (Oct. 31, 1989); 39 Fed.Reg. 26061 (Jul. 16, 1974); Wat. Code, § 13377.)

25

Defendants and Dynegy suggest that, even if this is so, federal law does not prohibit resort to the Warren-Alquist Act's restrictive provisions for judicial review in cases where, as here, a proceeding for issuance or renewal of an NPDES permit coincides with a powerplant certification proceeding before the Energy Commission. Perhaps not. But under the Warren-Alquist Act itself, only "[t]he decisions of the [Energy] [C]ommission *on any application for certification of a site and related facility*" are subject to exclusive review in this court (Pub. Resources Code, § 25531, subd. (a), italics added), and other courts are deprived of jurisdiction only of a "case or controversy concerning [a] matter which *was, or could have been,* determined in a proceeding before the commission" (*id.*, subd. (c), italics added).

As we have seen, an NPDES permit decision by a regional water board is not an Energy Commission certification decision. Conversely, under California's EPA-approved NPDES permit program, neither commission certification proceedings, nor findings the commission may make in connection with such proceedings, can result in the issuance or renewal of an NPDES permit; only the State Water Board and the regional water boards may issue or renew such permits. Hence, a challenge to the issuance or renewal of an NPDES permit is not a "case or controversy concerning [a] matter which was, or could have been, determined" by the commission. (Pub. Resources Code, § 25531, subd. (c).)

Nothing in the Warren-Alquist Act states or implies that where a powerplant has concurrently sought both a renewal from the Regional Water Board of its NPDES wastewater discharge permit, and an Energy Commission certification to install additional generating capacity, the regional water board's decision, normally reviewable in the superior court pursuant to the Porter-Cologne

26

Act, is suddenly subject to the exclusive-review provisions of the Warren-Alquist Act. We see no basis for reading such a requirement into the latter statue.[10]

---

[10] Dynegy alludes to the portion of Public Resources Code section 25531, subdivision (c) which states that "[s]ubject to the right of judicial review [in this court] of decisions of the [Energy] [C]ommission, no court . . . has jurisdiction . . . to *stop or delay* the construction *or operation* of any thermal powerplant except to enforce compliance with . . . a decision of the commission." (Italics added.) Dynegy implies that because the superior court was thus deprived of authority to enforce any NPDES permit ruling it might make by "stop[ping] or delay[ing]" the wastewater discharge "operation[s]" of the MLPP, it must therefore have been deprived of all jurisdiction to entertain a challenge to the ruling. Like the Court of Appeal, we conclude we need not, and we do not, directly address whether the superior court had "stop or delay" authority, because no such stoppage or delay was sought or ordered in this case. But we do have serious doubts about Dynegy's premise. We have explained that under federal and California water quality laws, all industrial facilities, including thermal powerplants, that discharge waste water into navigable water sources may only do so under the terms of valid NPDES permits. The State Water Board and the regional water boards have exclusive authority and responsibility to issue, renew, and administer such permits, and a powerplant certification by the Energy Commission cannot operate "in lieu" (Pub. Resources Code, § 25500) of a properly issued, federally required NPDES permit. Review of a decision of the State Water Board or a regional water board is by mandamus in the superior court, which court, upon proper evidence and findings, may command the agency to "set aside [its] order or decision," and direct the agency "to take such further action as is specially enjoined upon it by law." (Code Civ. Proc., § 1094.5, subd. (f).) Of course, the agency's compliance with such an order withdraws the federal and state legal authority for the plant's wastewater discharge "operation[s]." Moreover, if the State Water Board or a regional water board perceives a "threatened or continuing" violation of the permit provisions, it may require the Attorney General to seek direct injunctive relief against the violator. (Wat. Code, § 13386.)

Construed literally, the no "stop or delay" provision of Public Resources Code section 25531, subdivision (c), would entirely swallow these provisions as applied to thermal powerplants; it would *never* allow a superior court to prevent the illegal wastewater activities of such a plant "except to enforce compliance with . . . a decision of *the* [*Energy*] [*C*]*ommission*"— an agency which, *even in connection with a powerplant certification*, has no direct authority over wastewater discharge violations, or the issuance, renewal, or administration of NPDES permits.

*(Footnote continued on next page.)*

27

Defendants and Dynegy stress that the purposes of the Warren-Alquist Act, including its "one stop" permit process and its provision for exclusive judicial review, are to consolidate the state's regulation of electrical generation and transmission facilities, and to expedite the operative effect of powerplant certifications by the Energy Commission. (See, e.g., Pub. Resources Code, § 25006; *County of Sonoma v. State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 368; *Public Utilities Com. v. Energy Resources Conservation & Dev. Com.* (1984) 150 Cal.App.3d 437, 453.) Superior court jurisdiction in this case, they urge, defeats these statutory aims.

However, as we have explained, a federal law, the CWA, requires all industrial facilities, including thermal powerplants, that discharge wastewater into navigable water sources to have in effect unexpired NPDES permits authorizing such discharge. This requirement is independent of the Energy Commission's certification, under California law, of an application to locate, construct, or expand such a powerplant. As defendants and Dynegy concede, a state statute, the Porter-Cologne Act — specifically approved by the federal agency responsible for authorizing state administration of the CWA's requirements — assigns the issuance and renewal of NPDES permits exclusively to the State Water Board and

---

*(Footnote continued from previous page.)*

Fairly read in context, and properly harmonized with the requirements of federal and state water quality laws, the cited portion of Public Resources Code section 25531, subdivision (c), like the rest of the section, operates only with respect to "decisions" *properly within the purview of the Energy Commission*, i.e., powerplant certifications. The subdivision precludes any court except this court from "stop[ping] or delay[ing]" the "operation" of a thermal powerplant insofar as such "operation" is authorized by the Energy Commission's decision, under the Warren-Alquist Act, to certify the plant's siting, construction, or expansion.

28

the regional water boards.  Although the Energy Commission must make a general finding, before issuing a powerplant certification, that the project conforms to all applicable local, regional, state, and federal laws, such a certification cannot contravene, subsume, encompass, supersede, substitute for, or operate in lieu of, the federally required NPDES permit.

The Porter-Cologne Act provides that review of NPDES permit decisions by the State Water Board or the regional water boards is in the superior court.  No provision of either the Porter-Cologne Act or the Warren-Alquist Act states or suggests that these review provisions are altered simply because an NPDES permit issuance or renewal proceeding took place concurrently, or in connection, with a certification proceeding for the same powerplant.  Hence, we have no basis to conclude that the purposes of the Warren-Alquist Act are impaired by recognizing superior court jurisdiction under the circumstances of this case.

For these reasons, we conclude that the superior court had subject matter jurisdiction of the instant mandamus proceeding.

### B.  Interlocutory remand.

Plaintiff urges that under section 1094.5, once the trial court found insufficient evidence to support the Regional Water Board's finding No. 48 (the BTA finding), the court had no choice but to render a final mandamus judgment directing the board to set aside its Order No. 00-041, renewing the MLPP's wastewater discharge permit.  The court thus erred, plaintiff insists, when it instead (1) retained jurisdiction pending an interlocutory remand to the board for reconsideration of finding No. 48; (2) allowed the board to take new evidence and reaffirm its finding; then (3) denied mandamus relief after concluding that the administrative record, as augmented on remand, supported the board's determination.  We conclude that no error occurred.

29

Plaintiff bases its argument on two portions of section 1094.5 —

subdivisions (e) and (f). Subdivision (e) provides that "[w]here the court finds that

there is relevant evidence that, in the exercise of reasonable diligence, could not

have been produced or that was improperly excluded at the hearing before [the

agency], it may enter judgment as provided in subdivision (f) remanding the case

to be reconsidered in the light of that evidence; or, in cases in which the court is

authorized by law to exercise its independent judgment on the evidence, the court

may admit the evidence at the hearing on the writ without remanding the case."

Subdivision (f) states that "[t]he court shall enter judgment either commanding

respondent [the agency] to set aside the order or decision, or denying the writ.

Where the judgment commands that the order or decision be set aside, it may

order the reconsideration of the case in the light of the court's opinion and

judgment . . . ."

Read together, plaintiff asserts, these provisions establish that the court

(1) may order the administrative agency to reconsider its decision only as part of a

final judgment granting a writ of mandate; (2) in such event, must specify that the

entire "case" be reconsidered; and (3) may allow the agency, upon

reconsideration, to accept and consider new evidence *only* when such evidence (a)

could not earlier have been produced before the agency with due diligence or (b)

was improperly excluded at the initial administrative hearing.

As plaintiff observes, defendants and Dynegy do not claim that the

evidence the court found wanting was unavailable at the time of the Regional

Water Board's proceedings, or that the agency improperly rejected an attempt to

present such evidence. Hence, plaintiff urges, upon concluding that the board's

BTA finding was not supported by the weight of the evidence then contained in

the administrative record, the trial court was required to enter a final judgment

30

granting the requested writ of mandamus and overturning the agency's permit renewal order in its entirety.

We conclude, however, that, properly understood and interpreted, subdivisions (e) and (f) of section 1094.5 impose no absolute bar on the use of prejudgment limited remand procedures such as the one employed here. Moreover, when a court has properly remanded for agency reconsideration on grounds that all, or part, of the original administrative decision has insufficient support in the record developed before the agency, the statute does not preclude the agency from accepting and considering additional evidence to fill the gap the court has identified.

To determine the meaning of these provisions, we must first examine their words, which have remained unchanged since section 1094.5 was adopted over six decades ago. (Stats. 1945, ch. 868, § 1, pp. 1636-1637.). The statutory language simply does not support the arbitrary and restrictive construction plaintiff advocates. On its face, subdivision (f) of section 1094.5 indicates the form of *final judgment* the court may issue in an administrative mandamus action. Unremarkably, subdivision (f) states that the last step the trial court shall take in the proceeding is either to command the agency to set aside its decision, or to deny the writ. The trial court here followed that mandate; it issued a final judgment denying a writ of mandamus.

As defendants and Dynegy observe, nothing in subdivision (f) of section 1094.5 purports to limit procedures the court may appropriately employ *before* it renders a final judgment. A more general statute covers that subject. Code of Civil Procedure section 187, adopted in 1872, broadly provides that whenever the Constitution or a statute confers jurisdiction on a court, "all the means necessary to carry it [that jurisdiction] into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding *be not specifically pointed out* by this code

31

or the statute, *any suitable process or mode of proceeding may be adopted* which may appear most conformable to the spirit of this code." (Italics added.)

Subdivision (f) of section 1094.5 does not "specifically point[ ] out" the prejudgment procedures to be followed in an administrative mandamus action, nor do its terms prohibit the court from "adopt[ing]" a "suitable process or mode of proceeding" when addressing the issues presented. (Code Civ. Proc., § 187.) Hence, we find nothing in subdivision (f)'s language that suggests an intent to limit or repeal Code of Civil Procedure section 187 for purposes of administrative mandamus actions. (See, e.g., *Ste. Marie v. Riverside County Regional Park & Open-Space Dist.*, *supra*, 46 Cal.4th 282, 296 [implied repeals disfavored].)

Extrinsic aids to interpretation do not persuade us otherwise. The limited available legislative history of section 1094.5 does not suggest the Legislature's intent to limit the application of Code of Civil Procedure section 187, as it might appropriately apply in administrative mandamus actions, or to categorically confine the mandamus court only to postjudgment remands. (See, e.g., Cal. Dept. of Justice, Inter-Departmental Communication to Governor re Sen. Bill No. 736 (1945 Reg. Sess.) June 7, 1945, pp. 1-3; Cal. Legis. Counsel, Rep. on Sen. Bill No. 736 (1945 Reg. Sess.) June 9, 1945, pp. 1-2.)

Decisions have long expressed the assumption that the court in a mandamus action has inherent power, in proper circumstances, to remand to the agency for further proceedings prior to the entry of a final judgment. (See, e.g., *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 81 (*No Oil*) [professing no "question" of trial court's power in traditional mandamus to order interlocutory remand to agency for clarification of findings]; *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 600 [noting there is "no question" of a court's power under Code Civ. Proc., § 187 to remand, prior to a final mandamus judgment, for further necessary and appropriate agency proceedings; "aside from" court's power under

32

§ 1094.5 to enter judgment remanding for consideration of evidence not available, or improperly excluded, in original agency proceeding, "such a power to remand" prior to judgment "also exists under the inherent powers of the court"]; *Garcia v. California Emp. Stab. Com.* (1945) 71 Cal.App.2d 107, 114 [in original mandamus action, Court of Appeal, without issuing final judgment, remanded for further agency proceedings after finding that evidence in administrative record was insufficient to support denial of unemployment benefits].)  In *Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist.* (1986) 185 Cal.App.3d 996 (*Rapid Transit Advocates*), an administrative mandamus action governed by section 1094.5, the Court of Appeal, citing *No Oil* and *Keeler*, expressly upheld the trial court's order continuing the trial and remanding for clarification of the agency's findings.  (*Rapid Transit Advocates*, *supra*, at pp. 1002-1003.)

We perceive no compelling reason why the Legislature would have wished to categorically bar interlocutory remands in administrative mandamus actions. Though its arguments have varied somewhat, we understand plaintiff to raise two basic objections to such a procedure.

First, plaintiff insists, the purpose of an administrative mandamus suit is to determine, once and for all, whether an agency has acted "without, or in excess of jurisdiction," in that the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (§ 1094.5, subd. (b).)  If the agency's action, as originally presented for review, is found defective by these standards, plaintiff urges, that action must simply be set aside, and the administrative process — assuming further proceedings are appropriate at all — must begin anew.  Plaintiff contends the instant trial court violated these principles by withholding final judgment on the validity of the Regional Water Board's NPDES permit

33

determination while allowing the agency to reconsider, and justify, a single finding the court had deemed insufficiently supported.

Second, plaintiff seems to suggest, a limited prejudgment remand raises the danger of a sham proceeding, in which interested parties are denied the opportunity to argue or present evidence, and the agency simply concocts a post hoc rationalization for the decision it has already made. Such concerns appear paramount in two Court of Appeal decisions that expressly disagreed with *Rapid Transit Advocates*, *supra*, 185 Cal.App.3d 996, and broadly asserted that section 1094.5 bars interlocutory, as opposed to postjudgment, remands in administrative mandamus proceedings. (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1220-1222; *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 898-900 (*Resource Defense Fund*).)

But considerations of fairness and proper agency decisionmaking do not justify the absolute prohibition for which plaintiff argues. Significantly, subdivision (f) of section 1094.5 provides that, when granting mandamus relief, the court may "order the reconsideration of the case *in the light of the court's opinion and judgment*." (Italics added.) This clearly implies that, in the final judgment itself, the court may direct the agency's attention to specific portions of its decision that need attention, and need not necessarily require the agency to reconsider, de novo, the entirety of its prior action. That being so, no reason appears why, in appropriate circumstances, the same objective cannot be accomplished by a remand prior to judgment. Indeed, such a device, properly employed, promotes efficiency and expedition by allowing the court to retain jurisdiction in the already pending mandamus proceeding, thereby eliminating the potential need for a new mandamus action to review the agency's decision on reconsideration.

34

We agree with plaintiff, and with the courts in *Sierra Club v. Contra Costa County* and *Resource Defense Fund*, that any agency reconsideration must fully comport with due process, and may not simply allow the agency to rubber-stamp its prior unsupported decision. Indeed, the judgments in *Sierra Club v. Contra Costa County* and *Resource Defense Fund* could have been based solely on the conclusions of the Courts of Appeal in those cases that the particular agency decisions on remand suffered from such flaws.[11]

However, a limited interlocutory remand raises no greater inherent danger in these regards than does a final judgment ordering limited reconsideration, as

---

[11]    Thus, in *Resource Defense Fund*, a case involving the California Environmental Quality Act (CEQA), the trial court ordered an interlocutory remand to allow a city council to supply *missing* findings in support of an annexation approval. The order simply provided that the court would enter judgment after the council's action, or the expiration of 60 days. The Court of Appeal noted that this sparse and abbreviated procedure raised "serious questions of due process: it effectively precluded any possible challenge to the sufficiency of the evidence to support the new findings" and "fostered a *post hoc* rationalization . . . ." (*Resource Defense Fund*, *supra*, 191 Cal.App.3d 886, 900.) In *Sierra Club v. Contra Costa County*, the trial court determined that an environmental impact report (EIR), required by CEQA, was inadequate because it failed to fully analyze, and the county board of supervisors had thus failed to fully consider, less environmentally damaging alternatives to a massive residential development approved by the board. The court nonetheless denied the mandamus relief requested by opponents of the development, " 'with the exception that the County should administratively make further findings on alternatives.' " (*Sierra Club v. Contra Costa County*, *supra*, 10 Cal.App.4th 1212, 1216.) The board then adopted supplemental findings. Promptly thereafter, the court found the EIR, as so augmented, to be " 'legally adequate in all respects,' " whereupon the court discharged the alternative writ and entered judgment for the county. (*Id.*, at pp. 1216-1217.) Besides finding that this procedure did not satisfy the specific requirements of CEQA, the Court of Appeal stressed that, as was the case in *Resource Defense Fund*, the trial court's procedure raised serious questions of due process by insulating the board's supplemental findings "from any meaningful challenge." (*Sierra Club v. Contra Costa County*, *supra*, at p. 1221.)

35

expressly authorized by subdivision (f) of section 1094.5. No fundamental concerns about fair, sound, and complete agency decisionmaking impose the need for a categorical bar on such prejudgment remands.

Accordingly, we are persuaded that subdivision (f) of section 1094.5 imposes no blanket prohibition on the appropriate use, in an administrative mandamus action, of a prejudgment remand for agency reconsideration of one or more issues pertinent to the agency's decision. We reject plaintiff's contrary argument. To the extent the Courts of Appeal in *Resource Defense Fund* and *Sierra Club v. Contra Costa County* concluded otherwise, we will disapprove those decisions.

We are further convinced that the interlocutory remand in this case was not employed, or conducted, improperly. Under the circumstances presented, the trial court's choice to utilize this device was eminently practical. Plaintiff's mandamus petition challenged only a single, discrete facet of the lengthy and complex NPDES permit order — the order's treatment of the BTA issue. The trial court ultimately concluded that a single finding on this issue — finding No. 48 — lacked evidentiary and analytic support. Confronted with this situation, the trial court reasonably concluded it need not, and should not, enter a final judgment vacating the entire permit pending further consideration of that issue.

Such a judgment, even if it included an order narrowing the issues, would have required a new permit proceeding and, most likely, a new mandamus action to review the resulting decision. In the interim, the MLPP's authority to use the cooling system essential to its electrical generation operations would be cast in doubt. Instead, the court reasonably decided it could achieve the necessary further examination of the BTA issue by postponing a final judgment pending the Regional Water Board's focused reconsideration of that matter. The court thus

36

properly exercised its inherent authority to adopt a "suitable process or mode of proceeding" in aid of its jurisdiction. (Code Civ. Proc., § 187.)

Moreover, unlike the procedures at issue in *Resource Defense Fund* and *Sierra Club v. Contra Costa County*, the instant remand was not unfair, and it produced no mere post hoc rationalization by the agency. On the contrary, in compliance with the trial court's directive, the Regional Water Board engaged in a full reconsideration of the BTA issue, and gave all interested parties, including plaintiff, a noticed opportunity to appear and to present evidence, briefing, and argument pertinent to the BTA determination.

Nor was the Regional Water Board's finding on remand insulated from meaningful review. Plaintiff was able to pursue, and did pursue, its statutory right to seek an administrative appeal of the board's BTA finding on remand, and then was allowed, in the resumed judicial proceedings, a full opportunity to dispute the foundation for that finding.

For all these reasons, we find no error in the trial court's use of an interlocutory remand to resolve perceived deficiencies in the Regional Water Board's BTA finding.

We similarly reject plaintiff's argument that subdivision (e) of section 1094.5 precluded the Regional Water Board from accepting and considering new evidence on remand absent a showing that such evidence could not have been produced at the original administrative proceeding, or was improperly excluded therefrom. We do not read subdivision (e) to impose such a limitation under the circumstances presented here.

As explained above, subdivision (e) of section 1094.5 provides that "[w]here the court finds that there *is relevant evidence*" (italics added) which could not with reasonable diligence have been produced, or was improperly excluded, in the administrative proceeding, the court may remand the case "to be

37

reconsidered in light of *that evidence*." (Italics added.) To the extent this language is ambiguous, plaintiff extracts the most radical interpretation — that when a court, for whatever reason, directs or authorizes the agency to reconsider its prior decision, in whole or in part, the agency is always confined to the evidence it previously received, with the exception of evidence the court determines was unavailable, or wrongly excluded, in the original administrative proceeding.

But the precise circumstances of this case illustrate why plaintiff's construction makes little sense. The instant trial court found that the Regional Water Board's finding No. 48 was *not sufficiently supported* by the original administrative record. The only possible cure for such a deficiency is the agency's reconsideration of its decision *on the basis of additional evidence*. Plaintiff's construction of subdivision (e) of section 1094.5 would categorically preclude the court, except in narrow circumstances, from authorizing the agency to reach a better considered and better supported result *on a sufficient record*. Unless those narrow exceptions applied, any reconsideration at all would thus simply be futile; the very flaw the court had found could not be remedied.

Yet section 1094.5 contains no other indication that the Legislature intended such a constraint on the scope of an agency reconsideration directed or authorized by the court. Indeed, subdivision (f) broadly provides that when the court directs the agency decision to be set aside, it "may order the reconsideration of the case in the light of the court's opinion and judgment . . . but the judgment shall not limit or control in any way the discretion legally vested in the [agency]." The implication is plain that if, as here, the court finds the administrative record *insufficient* to support the original agency determination, it may order reconsideration *in the light of that judicial finding* — i.e., a reconsideration in

38

which the agency may entertain all the additional evidence necessary to support its new decision.

Moreover, had the instant trial court simply vacated the Regional Water Board's issuance of the NPDES permit in this case, the MLPP's owner could, should, and would simply have commenced a new permit proceeding before the board. Plaintiff does not suggest that, in such a new proceeding, the board would be limited to the evidence it had considered before, plus only previously unavailable or improperly excluded evidence. On the contrary, the board would have been empowered to receive and consider, de novo, all evidence pertinent to its decision whether to issue the requested permit. Accordingly, there is no reason to conclude the board lacks such authority when directed or ordered by the court to reconsider an insufficiently supported decision.

Albeit with little analysis, a number of decisions have expressed the unremarkable principle that, when an agency determination is set aside for *insufficiency of the evidence* in the administrative record, the proper course is to remand to the agency for further appropriate proceedings — presumably the agency's consideration of additional evidence as the basis for its decision on reconsideration. (See, e.g., *Fascination, Inc. v. Hoover* (1952) 39 Cal.2d 260, 268; *La Prade v. Department of Water & Power* (1945) 27 Cal.2d 47, 53; *Carlton v. Department of Motor Vehicles* (1988) 203 Cal.App.3d 1428, 1434.)

Accordingly, we are persuaded that section 1094.5, subdivision (e) is not intended to prevent the court, upon finding that the administrative record itself *lacks* evidence sufficient to support the agency's decision, from remanding for consideration of additional evidence. A more reasonable interpretation, which fully honors the statutory language, is that subdivision (e) simply prevents a mandamus petitioner from challenging an agency decision that *is* supported by the

39

administrative record on the basis of evidence, presented to the court, which could have been, but was not, presented to the administrative body.

This interpretation adheres most closely to the literal words of section 1094.5, subdivision (e). As noted, the subdivision provides that when the court determines there "is relevant evidence" meeting the statutory criteria, it may remand to the agency for consideration of "that evidence," or, in cases where the court is authorized to weigh the evidence independently, the court may "admit *the evidence*" (italics added) in the judicial proceeding itself. Read most naturally, this language contemplates a situation in which a party to the mandamus action has actually proffered to the court specific evidence not included in the administrative record. Subdivision (e) provides that the court may remand for agency consideration of *such evidence*, or may consider the evidence itself, only if *that evidence* could not reasonably have been presented, or was improperly excluded, at the administrative proceeding.

Thus, subdivision (e) of section 1094.5 merely confirms that while, in most cases, the court is limited to the face of the administrative record in deciding whether the agency's decision is valid as it stands, in fairness, the court may consider, or may permit the agency to consider, extra-record evidence for a contrary outcome, if persuaded that such evidence was not available, or was improperly excluded, at the original agency proceeding. (See *No Oil*, *supra*, 13 Cal.3d 68, 79, fn. 6 [in administrative mandamus action, "the court reviews the administrative record, receiving additional evidence only if that evidence was unavailable at the time of the administrative hearing, or improperly excluded from the record"].)

The limited available legislative history of Senate Bill No. 736 (1945 Reg. Sess.), in which section 1094.5 was adopted, is consistent with this view. The Department of Justice advised the Governor that the bill was designed to settle

40

areas of confusion which had arisen about judicial review of administrative decisions, and would, as "a most important consideration, . . . permit the court to remand administrative proceedings for further consideration by the administrative agency in cases where relevant evidence was not available or was wrongfully excluded from the administrative hearings *so that the administrative agency, rather than the court, may finally determine the whole proceeding and the court may in turn actually review the administrative action. The latter consideration accords both to the administrative agency and the reviewing court their primary functions and the opportunity of carrying out the legislative intent in authorizing the administrative agency to conduct and determine its own proceedings.*" (Cal. Dept. of Justice, Inter-Departmental Communication to Governor re Sen. Bill No. 736 (1945 Reg. Sess.) June 7, 1945, p. 1, italics added.)

This explanation indicates an intent to provide that where the reviewing court learns of evidence the agency should have considered, but did not or could not do so for reasons beyond the control of the participants in the administrative proceeding, the court may give the agency, the appropriate primary decisionmaker, the opportunity to include this evidence in its determination, subject to the court's limited review of the resulting administrative record for abuse of discretion. Nothing suggests, on the other hand, that the court is powerless to allow reconsideration by the agency, with such additional evidence as the agency may find appropriate, when the court finds, in the first instance, that there is not enough evidence in the original administrative record to support the agency's decision.

The decisional law also generally supports our conclusion. Courts have most frequently applied subdivision (e) of section 1094.5 simply to determine

41

whether and when an agency decision may be challenged on mandamus with

evidence outside the administrative record.**12**  On the other hand, our research has

<hr />

**12**    E.g., *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 863 (in administrative mandamus action challenging coastal zone permit, evidence proffered by mandamus petitioner, which was not part of administrative record, that coastal commission members did not personally review final EIR before granting permit, could not be considered); *State of California v. Superior Court* (1974) 12 Cal.3d 237, 257 (in administrative mandamus action challenging coastal zone permit, mandamus petitioner was not entitled to propound interrogatories to determine whether coastal commission denied fair hearing by receiving, and relying upon, secret prehearing testimony by commission staff); *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 366-367 (in administrative mandamus action by neighborhood organization challenging city's allowance of nonconforming school playground, court could not consider mandamus petitioner's proffer of correspondence to and from city officials, not included in administrative record, as evidence of school's " 'ongoing land use violations' "); *Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101-109 (under § 1094.5, subd. (e), discovery to obtain evidence that administrative hearing was not fair is permissible only if evidence sought is relevant and could not, with reasonable diligence, have been presented in administrative proceeding); *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1591-1598 (expression of expert opinion that postdates administrative proceeding is not truly "new" evidence of "emergent facts" which would justify remand, at mandamus petitioner's behest, under § 1094.5, subd. (e)); *Elizabeth D. v. Zolin* (1993) 21 Cal.App.4th 347, 355-357 (in administrative mandamus action challenging suspension of driver's license on ground of licensee's seizure disorder, mandamus petitioner could obtain remand to Department of Motor Vehicles (DMV) under § 1094.5, subd. (e) for consideration of physician's declaration, which postdated DMV hearing, that disorder was being well controlled by medication); *Armondo v. Department of Motor Vehicles* (1993) 15 Cal.App.4th 1174, 1180 (in mandamus action challenging administrative suspension of driver's license based on breathalyzer results, court properly excluded, absent showing that § 1094.5, subd. (e) exception applied, petitioner's proffered evidence that local crime laboratory was not licensed to use particular breathalyzer model); *Toyota of Visalia, Inc. v. New Motor Vehicle Bd.* (1987) 188 Cal.App.3d 872, 881-882 (car dealer seeking mandamus review of administrative discipline could introduce evidence outside administrative record on issue of appropriate penalty only if such evidence could not, with reasonable diligence, have been presented in administrative proceeding); *Windigo Mills v.*

*(Footnote continued on next page.)*

disclosed only two decisions holding or suggesting that section 1094.5 precludes a remand for new evidence when, as happened here, the trial court finds that the existing administrative record simply fails to support the agency's original determination.

Thus, in *Ashford v. Culver City Unified School Dist.* (2005) 130 Cal.App.4th 344 (*Ashford*), the Court of Appeal held that except under the circumstances specifically set forth subdivision (e) of section 1094.5, there was no ground for a remand to give a public employer a second chance to provide additional evidence in support of the original, inadequately founded, administrative decision to terminate an employee. (*Ashford*, *supra*, at pp. 350-354.) Similarly, in *Newman v. State Personnel Bd.* (1992) 10 Cal.App.4th 41 (*Newman*), the Court of Appeal concluded that the trial court erred when, after finding insufficient evidence in the administrative record to support the medical termination of a California Highway Patrol (CHP) employee, the court remanded for further proceedings. In the Court of Appeal's view, subdivision *(f)* of section 1094.5 prevented a remand for agency reconsideration when the agency had failed to reach a result substantially supported by the evidence. The Court of Appeal

*(Footnote continued from previous page.)*

*Unemployment Ins. Appeals Bd.* (1979) 92 Cal.App.3d 586, 596-597 (administrative mandamus petitioner may introduce evidence beyond administrative record if such evidence relates to events that postdate agency proceeding); see also *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 (evidence outside administrative record was not admissible in traditional mandamus action to determine, under Pub. Res. Code, § 21168.5, a provision of CEQA, whether the agency's decision constituted a " 'prejudicial abuse of discretion,' " either because the agency " '[did] not proceed[ ] in a manner required by law,' " or because its decision was not supported by " 'substantial evidence' ").

stated that the CHP had failed in its burden to prove grounds for the employee's dismissal, and was "not now entitled to a second opportunity to establish its case." (*Newman*, *supra*, at p. 49.)

*Ashford* and *Newman* illustrate circumstances in which due process principles entirely separate from section 1094.5 may preclude successive administrative proceedings. It may well be, as *Ashford* and *Newman* suggested, that there should be no second chance to muster sufficient evidence to impose administrative sanctions on a fundamental or vested right, such as the right against dismissal from tenured public employment except upon good cause.

But we find no such categorical bar in section 1094.5 itself. The quasi-judicial administrative proceedings governed by this statute include a wide variety of matters, including applications for permits and licenses, that have nothing to do with disciplinary or punitive sanctions. Here, as plaintiff concedes, even if the instant trial court had vacated the MLPP's NPDES permit renewal for lack of evidence, the plant could, should, and would have begun anew the process for obtaining this permit, essential to the continuation of its electrical generation operations. In this new proceeding, the Regional Water Board could, should, and would have considered all evidence relevant to its permit decision, regardless of whether that evidence had been presented in the prior proceeding. No reason appears to construe section 1094.5 to preclude such new evidence when the court, having found insufficient record support for the agency's decision, remands for reconsideration of that matter.

In sum, section 1094.5, subdivision (e), promotes orderly procedure, and the proper distinction between agency and judicial roles, by ensuring that, with rare exceptions, the court will review a quasi-judicial administrative decision on the record actually before the agency, not on the basis of evidence withheld from the agency and first presented to the reviewing court. But once the court has

44

reviewed the administrative record, and has found it wanting, section 1094.5 does not preclude the court from remanding for the agency's reconsideration in appropriate proceedings that allow the agency to fill the evidentiary gap. To the extent the analyses in *Ashford* and *Newman* are inconsistent with these conclusions, we will disapprove those decisions.

Here, the trial court found that the administrative record did not support one finding by the agency in support of its issuance of a permit essential to the permittee's operations. Hence, the court acted properly by remanding to the agency for additional evidence and analysis on this issue. No error occurred.

**C. "Best technology available" under CWA section 316(b).**

As indicated, finding No. 48 of the Regional Water Board's order issuing the MLPP's 2000 NPDES permit renewal addressed the requirement, under CWA section 316(b), that "the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact." (33 U.S.C. § 1326(b).) In this regard, the board determined that "[i]f the cost of implementing any alternative for achieving BTA is wholly disproportionate to the environmental benefits to be achieved, the Board may consider alternative methods to mitigate these adverse environmental impacts." The board further found that, though the MLPP's existing once-through cooling system would be modified and upgraded in certain respects to minimize adverse impacts on aquatic life, proposed alternatives to this basic system were "wholly disproportionate to the environmental benefits." After complying, on remand, with the superior court's directive to analyze the available technologies more closely, the board confirmed finding No. 48, and the superior court denied mandamus.

As we have noted, shortly before the superior court issued its final judgment, the EPA promulgated the Phase II regulations applying CWA section

45

316(b)'s BTA standard to *existing* electric powerplants. (69 Fed.Reg., *supra*, p. 41576; 40 C.F.R. § 125.90 et seq. (2011)). The Phase II regulations did not follow the approach of the Phase I regulations, which had required *new* powerplants either to adopt closed-cycle cooling systems or to achieve comparable environmental performance — i.e., up to 98 percent reductions in impingement and entrainment mortality relative to typical once-through systems. (69 Fed.Reg., *supra*, pp. 41576, 41601, 41605.) The EPA declined to impose such a stringent requirement on existing powerplants because it concluded that conversion to closed-cycle systems was impossible or economically impracticable for many existing facilities, that such conversions could have adverse impacts on the environment and on the plants' production and consumption of energy, and that other, less costly technologies could approach the environmental benefits of closed-cycle systems. (*Id.*, at p. 41605.)

Instead, therefore, the Phase II regulations set national performance standards requiring an existing facility to reduce impingement and entrainment mortality rates by from 60 to 95 percent compared to the rates estimated to arise from a typical once-through system at the site. (40 C.F.R. §§ 125.93, 125.94(b)(1), (2) (2011).) The regulations provided alternative means of achieving compliance, based on a range of available technologies the EPA had determined were "commercially available and economically practicable." (40 C.F.R. § 125.94(a) (2011); 69 Fed.Reg., *supra*, pp. 41576, 41602.)

The Phase II regulations also allowed a powerplant to seek and receive a site-specific variance from the standards. Such a variance could be obtained by establishing that the plant's costs of literal compliance would be "significantly greater" than (1) the costs the EPA had considered in setting the performance standards or (2) "the benefits of compliance" with the standards. (40 C.F.R. § 125.94(a)(5)(i), (ii) (2011).) If a variance was granted, the plant would be

required to employ remedial measures that yielded results "as close as practicable to the applicable performance standards." (*Ibid.*)

While the instant appeal was pending, the Second Circuit addressed the Phase II regulations in *Riverkeeper II*. The federal court held that while section 316(b) of the CWA allows consideration of extreme forms of economic burden or unfeasibility, the Phase II regulations were invalid under section 316(b) insofar as, among other things, they determined BTA, or allowed such a site-specific determination, based on mere cost-benefit analysis — i.e., a simple comparison between the expense of a particular cooling system technology and its expected environmental benefits. (*Riverkeeper II*, *supra*, 475 F.3d 83, 98-105, 114-115.) Nonetheless, the Court of Appeal in this case subsequently upheld the Regional Water Board's "wholly disproportionate" determination, concluding that it was not foreclosed by *Riverkeeper II*.

On review in this court, plaintiff, relying heavily on *Riverkeeper II*, renewed its argument that the Regional Water Board had employed a cost-benefit analysis forbidden by CWA section 316(b). At the time we granted review, petitions for certiorari were pending in *Riverkeeper II*. The United States Supreme Court thereafter granted certiorari and rendered its decision in *Entergy Corp. Entergy Corp.* reversed *Riverkeeper II*, unequivocally holding that "the EPA *permissibly* relied on cost-benefit analysis in setting the national performance standards and in providing for cost-benefit variances from those standards as part of the Phase II regulations. The Court of Appeals' reliance in part on the agency's use of cost-benefit analysis in invalidating the site-specific cost-benefit variance provision [citation] was therefore in error, as was its remand of the national performance standards for clarification of whether cost-benefit analysis was impermissibly used [citation]." (*Entergy Corp*, *supra*, 556 U.S. 208, ___ [129 S.Ct. 1498, 1510], italics added.)

47

In our view, this holding clearly disposes of plaintiff's general claim that CWA section 316(b) prohibited the Regional Water Board from premising its BTA finding on a comparison of costs and benefits. Though the Regional Water Board's 2000 decision to renew the MLPP's NPDES permit preceded the Phase II regulations, and was not based upon them, there is no reason to assume the Regional Water Board, using its "best professional judgment" in the preregulatory era, was forbidden to apply a form of analysis the United States Supreme Court has determined was properly employed in subsequent regulations interpreting the statute at issue.

Moreover, a portion of the majority's opinion in *Entergy Corp.*, though dictum, undermines plaintiff's further contention that the particular cost-benefit standard employed by the Regional Water Board — i.e., whether the costs of alternatives to the MLPP's once-through cooling system were "wholly disproportionate" to the expected environmental benefits — was improper.

In his concurring and dissenting opinion in *Entergy Corp.*, Justice Breyer had asserted that, while he agreed some form of cost-benefit analysis was permissible under CWA section 316(b), the EPA had failed to explain why, in the Phase II regulations, it had abandoned its traditional "wholly disproportionate" standard in favor of one allowing site-specific variances where the costs of compliance were merely "significantly greater" than the anticipated benefits to the environment. (*Entergy Corp.*, *supra*, 556 U.S. 208, ___ [129 S.Ct. 1498, 1515] (conc. & dis. opn. of Breyer, J.).)

In response, the majority noted that the issue raised by Justice Breyer had no bearing on the basic permissibility of cost-benefit analysis, "the only question presented here." Nonetheless, the majority remarked, "It seems to us . . . that the EPA's explanation was ample. [The EPA] explained that the 'wholly out of proportion' standard was inappropriate for the existing facilities subject to the

48

Phase II rules because those facilities lack 'the greater flexibility available to new facilities for selecting the location of their intakes and installing technologies at lower costs relative to the costs associated with retrofitting existing facilities,' and because 'economically impracticable impacts on energy prices, production costs, and energy production . . . could occur if large numbers of Phase II existing facilities incurred costs that were more than 'significantly greater' than but not 'wholly out of proportion' to the costs in the EPA's record.' [Citation.]" (*Entergy Corp.*, *supra*, 556 U.S. 208, ___, fn. 8 [129 S.Ct. 1498, 1510, fn. 8].)

The clear implication is that the "wholly disproportionate" standard of cost-benefit analysis — the very standard employed by the Regional Water Board in this case — is *more stringent* than section 316(b) of the CWA requires for existing powerplants such as the MLPP. Rather, the *Entergy Corp.* majority suggested, the EPA was free, having "ampl[y]" explained and justified its choice, to select for such facilities a more lenient "significantly greater" standard of economic and environmental practicality. Under these circumstances, we discern no basis to hold that the board erred by basing its BTA determination on a finding that the costs of alternative cooling technologies for the MLPP were "wholly disproportionate" to the anticipated environmental benefits. We conclude that the board's use of this standard was proper.[13]

---

[13] Following the *Riverkeeper II* decision, the EPA withdrew the Phase II regulations (72 Fed.Reg. 37107-37109 (Jul. 9, 2007)), and they have not been reissued. We have taken judicial notice that in May 2010, seeking to fill the regulatory vacuum, the State Water Board adopted a Statewide Water Quality Control Policy on the Use of Coastal and Estuarine Waters for Powerplant Cooling (2010 Powerplant Cooling Policy). Under this policy, the State Water Board, rather than the regional water boards, will issue all NPDES permits to affected powerplants. Thermal powerplants with once-through cooling systems will be required, by specified compliance dates, to reduce intake flow rates to mandated levels, or to adopt other operational and/or structural controls to achieve

*(Footnote continued on next page.)*

## DISPOSITION

The Court of Appeal's judgment is affirmed.  To the extent the Court of Appeal decisions in *Ashford v. Culver City Unified School Dist.*, *supra*, 130 Cal.App.4th 344, *Sierra Club v. Contra Costa County.*, *supra*, 10 Cal.App.4th 1212, *Newman v. State Personnel Bd.*, *supra*, 10 Cal.App.4th 41, and *Resource Defense Fund v. Local Agency Formation Com.*, *supra*, 191 Cal.App.3d 886, are inconsistent with the views expressed herein, those decisions are disapproved.

BAXTER, J.


WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
KITCHING, J.*


\* Associate Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

*(Footnote continued from previous page.)*

commensurate reductions in impingement and entrainment mortality.  In the interim, affected plants must adopt mitigating measures to control impingement and entrainment damage.

Several powerplant owners, including Dynegy, have filed a petition for mandate challenging the 2010 Powerplant Cooling Policy.  (*Genon Energy, Inc., et al. v. State Water Resources Control Board, etc., et al.*, Super. Ct. Sac. County, Oct. 27, 2010, No. 2010-80000701.)

I fully concur in the majority opinion. I write separately only to point out a limitation on the scope of our decision today.

The majority correctly holds that Code of Civil Procedure section 1094.5, governing the procedure to be followed in adjudicating petitions for writ of administrative mandate, does not preclude a trial court from ordering an interlocutory remand requiring agency reconsideration of one or more specific findings or decisions; nor is the agency precluded, under this statute, from considering new evidence on such a remand. (Maj. opn., *ante*, at pp. 36-37.) Because the remand order at issue in this case related to compliance with a provision of the federal Clean Water Act (33 U.S.C. § 1326(b)) rather than to compliance with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), the majority has no occasion here to consider whether a trial court may, similarly, order remand for reconsideration of an agency decision for compliance with CEQA without issuing a writ of mandate.

Public Resources Code section 21168.9, subdivision (a) provides that if a court finds a public agency's finding or decision to have been made in violation of CEQA, "the court shall enter an order that includes one or more of the following" mandates. The statute specifically outlines the scope of the mandate to be issued, including as necessary that the agency void its findings and decisions, take any actions required to come into compliance with CEQA, and in the meantime

1

suspend any part of the project at issue that might cause an adverse environmental effect. (Pub. Resources Code, § 21168.9, subd. (a)(1)-(3).) Balancing these commands with protections against an overbroad writ, the statute limits the order to "only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division," provided the noncomplying portion of the decision or finding is severable from the complying portion. (*Id.*, subd. (b).) The order is to be made by "peremptory writ of mandate," and the trial court is to retain jurisdiction "by way of a return to the peremptory writ" to ensure agency compliance. (*Ibid.*)

Consequently, while CEQA challenges are often brought through a petition for administrative mandate under Code of Civil Procedure section 1094.5, CEQA contains its own detailed and balanced remedial scheme, offering protections for both agencies and those challenging agency action under CEQA. I do not read the majority's analysis of the administrative mandate procedure in this non-CEQA case as speaking to the procedures to be followed when an agency's action is found to have violated CEQA.

**WERDEGAR, J.**

**I CONCUR:**

**CANTIL-SAKAUYE, C. J.**

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Voices of the Wetlands v. California State Water Resources Control Board
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 157 Cal.App.4th 1268
**Rehearing Granted**

_____

**Opinion No.** S160211
**Date Filed:** August 15, 2011
_____

**Court:** Superior
**County:** Monterey
**Judge:** Robert A. O'Farrell

_____

**Counsel:**

Earthjustice, Mills Legal Clinic of Stanford Law School, Deborah A. Sivas, Leah J. Russin and Holly D. Gordon for Plaintiff and Appellant.

Kurt R. Wiese, Barbara Baird; Daniel P. Selmi; John J. Sansone, County Counsel (San Diego), Paula Forbis, Deputy County Counsel; Law Offices of Nancy Diamond, Nancy Diamond; Steven M. Woodside, County Counsel (Sonoma) and Cory W. O'Donnell, Deputy County Counsel, for South Coast Air Quality Management District, San Diego County Air Pollution Control District, North Coast Unified Air Quality Management District and Northern Sonoma County Air Pollution Control District as Amici Curiae on behalf of Plaintiff and Appellant.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Gordon Burns and Manuel M. Medeiros, State Solicitors General, J. Matthew Rodriquez, Chief Assistant Attorney General, Mary E. Hackenbracht and Kathleen Kenealy, Assistant Attorneys General, John Davidson, Anita E. Ruud and Michael M. Edson, Deputy Attorneys General, for Defendants and Appellants.

Pillsbury Winthrop Shaw Pittman, Sarah G. Flanagan, John M. Grenfell and Blaine I. Green for Real Parties in Interest and Appellants.

Michael J. Levy and William M. Chamberlain for California Energy Commission as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Deborah A. Sivas
Mills Legal Clinic of Stanford Law School
559 Nathan Abbott Way
Stanford, CA  94305-8610
(650) 723-0325

Anita E. Ruud
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5533

Sarah G. Flanagan
Pillsbury Winthrop Shaw Pittman
50 Fremont Street
San Francisco, CA  94120-7880
(415) 983-1000